McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
One Hovchild Plaza
4000 Rt. 66, 4th Floor
Tinton Falls, N 07753
(732) 733-6200
Attorneys for Plaintiff,
Principal Life Insurance Company

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JASON P. BRAND,<br><br>Defendant. | UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br><br>Civil Action No.: 2:15-cv-03804 (JMA)(GRB) |

## CIVIL ACTION - FIRST AMENDED COMPLAINT
## ON BEHALF OF PRINCIPAL LIFE INSURANCE COMPANY

Principal Life Insurance Company ("Principal Life"), by and through its attorneys McElroy, Deutsch, Mulvaney & Carpenter, LLP, by way of First Amended Complaint against the defendant Jason P. Brand ("Brand") alleges and says:

### INTRODUCTION

1. At all relevant times, Principal Life is an insurance company organized and existing under the laws of the State of Iowa, with its principal place of business located at 711 High Street, Des Moines, Iowa 50392-0410.

2. Principal Life brings this action against Brand to have a policy of disability income insurance issued to Brand declared null and void and rescinded, *ab initio*, because Brand

knowingly and intentionally made material misstatements and omissions in executing the application forms.

3. Principal Life further brings this action against Brand to have a policy of disability income insurance issued to Brand declared null and void and rescinded, *ab initio*, because Brand failed to satisfy the conditions precedent to the effectiveness of the policy because at the time the policy was issued, delivered and the initial premium paid, Brand was not actually in the state of health and insurability represented in the insurance applications.

## PARTIES

4. Principal Life is, and during all times relevant has been, in the business of underwriting policies of disability income insurance and is authorized to transact the business of insurance in the State of New York.

5. Brand is a resident of the State of New York, maintaining a primary residence and domicile at 23 Barrington Place, Melville, New York.

## JURISDICTION AND VENUE

6. This Court possesses subject matter jurisdiction based upon diversity of citizenship of the within parties pursuant to 28 U.S.C. § 1332.

7. Principal Life is a citizen of the State of Iowa within the meaning and intent of 28 U.S.C. § 1332.

8. Brand is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

9. There is complete diversity of citizenship between the parties to this action pursuant to 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000.00, exclusive of

interest and costs of suit.

10. Venue in the United States District Court for the Eastern District of New York is proper, because the acts giving rise to the controversy took place in New York within the meaning and intent of 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

11. On January 9, 2012, Brand completed and executed an application ("Application"), Parts A, B and C respectively, seeking the issuance of a policy of disability income insurance bearing policy no. ***5773 (the "Policy"). The Application is fully incorporated by reference as if same were fully set forth at length herein.

12. In executing the Application, Brand knew that he was required to provide complete, truthful, accurate and honest answers to the questions present on the Application, including medical history, physical condition, diagnosis, prognosis and treatment.

13. In executing the Application, Brand knew that Principal Life would rely upon the answers recorded thereon in determining whether Brand was insurable and otherwise qualified for the policy of disability income insurance applied for by Brand.

14. In executing the Application, Brand knew that he may be subject to civil and criminal penalties in the event he knowingly made any false or misleading statements in order to obtain the policy of disability income insurance.

15. In executing Part A of the Application seeking the issuance of the policy of disability income insurance, Brand applied for disability income benefits of $18,250 per month with a 90-day elimination period.

16. In executing Part A of the Application seeking the issuance of the policy of

3

disability income insurance, Brand was asked the following question:

> 7. Medical Question
>
> a. Within the last five years, have you been treated for, or been diagnosed as having a heart condition, chest pain, stroke, back or neck problem, sleep disorder, psychological condition (including, but not limited to, counseling from a mental health or substance abuse provider, and/or psychotherapy), cancer, diabetes, alcohol abuse, or drug dependence?

17. Brand responded and checked "Yes" to Question 7a of Part A of the Application. Question 7a further asks "If Yes, provide details in the Comments below, including date and healthcare provider's name and addresses." Brand provided the following comment, "back surgery lower lumbar spine 2009 herniated disk."

18. In completing Part B of the Application seeking the issuance of the policy of disability income insurance, Brand was asked the following questions concerning his medical history, and provided the following responses:

> 18. In the last ten years, have you had, been treated for or been diagnosed as having:
>
> * * *
>
> e. chronic fatigue, stress, depression, anxiety or any other emotional or psychological disorder?   ☐ Yes  ☒ No
>
> i. back or neck pain, disc problems, spinal sprain or strain, sciatica, arthritis, carpal tunnel syndrome, or any other disease or disorder of the bones, joints, or muscles?  ☒ Yes  ☐ No

19. The application required details for "Yes" answers including dates, details, diagnosis, types and results of treatment, health care provider's full name and address. Brand provided the following details:

> 18.a.   Hypertension – on medication – Toprol XL 25 mg 1x day.

4

    18.i. had lumbar disk surgery 2009.

Brand further identified his primary physician as Dr. Steven Goldberg.

  20. Questions 22 and 23 of the Application requested the following information to which Brand responded "No:"

>  22. In the last ten years:
>
> > a. Have you had any medical tests (other than an HIV test), hospitalization, illness or injury not provide in response to a previous question? (If yes, explain below).
> >
> > b. Have you consulted a doctor, chiropractor, psychiatrist, psychologist, counselor, therapist or other heathcare provider not provided in response to a previous question? (If yes, explain below).
>
>  23. Are you taking or have you been advised to take any medication or treatment not provided in response to a previous question? (If Yes, explain below).

  21. Given Brand responded "No" to Questions 22a, 22b and 23, he provided no details which were required with respect to these questions.

  22. On January 9, 2012, Brand completed and executed Part C of the Application, thereby specifically agreeing as follows:

> **AGREEMENT: Statements In Application(s):** I represent that all statements in this application(s) are true and complete to the best of my knowledge and belief and were correctly recorded before I signed my name below. I understand and agree that the statements in this application(s), including all of its parts, and statements by the Proposed Insured in any medical questionnaire(s) that becomes a part of this application(s), will be the basis of any insurance issued. I understand that material misrepresentations could mean denial of an otherwise valid claim and rescission of the policy during the contestable period.
>
> **When Coverage Becomes Effective:** I understand and agree that the Company shall incur no liability until: (1) a policy issued on this application(s) has been received and accepted by the owner and the first premium paid; and (2) at the

5

time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in this application(s), medical questionnaire(s), or amendment(s) that becomes a part of this application(s); and (3) the Part D of the completed Application or the Delivery Receipt form, and any required Amendment and Acceptance or other forms are signed by me and the Proposed Insured (if different) and dated at delivery. If these conditions are met, the policy is deemed effective on the Policy Date stated in the policy. If the application was submitted COD (cash on delivery) or a request for a change in the Policy date is received, the Policy Date may be changed to the date coverage becomes effective and a new Data Page will be sent to the Owner.

**Limitation of Authority:** I understand and agree that no licensed agent, broker, representative, telephone interviewer, or medical examiner has any authority to determine insurability, or to make, change, or discharge any contract, or to waive any of the Company's rights. The Company's right to truthful and complete answers to all questions on this application(s) and on any medical questionnaire(s) that becomes a part of this application(s) may not be waived. Subject to the Time Limit on Certain Defenses provision in the policy, no knowledge of any fact on the part of any licensed agent, broker, representative, telephone interviewer, medical examiner, or other person shall be considered knowledge of the Company unless such fact is stated in the application(s).

23. By signing the Application, Brand further represented, agreed and acknowledged as follows:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

24. On February 8, 2012, Brand executed an Amendment and Acceptance Form, acknowledging and accepting the following terms, provisions or amendments to the Policy. By executing the Amendment and Acceptance Forms, Brand thereby specifically represented and acknowledged:

- I have reviewed the Application (including any medical questionnaire) and this Amendment and Acceptance Form.

6

- To the best of my knowledge and belief, all statements in the Application, as amended, are true and complete as of the date I am signing this Amendment and Acceptance Form.

- Since the date the Application was signed, there has been no change in the Insured's health or any other information in the Application, except as specifically stated on this Amendment and Acceptance Form.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

25. On February 8, 2012, when Brand executed the Amendment and Acceptance Forms, Brand did not amend his answers to Question 7a of Part A of the Application or Questions 18e, 18i, 22a, 22b, and 23 of Part B of the Application.

26. Based on Brand's statements and representations contained in the Application and the Amendment and Acceptance Forms for the policy of disability income insurance, and relying upon Brand's complete answers, candor, honesty and openness in disclosing relevant information on the Application, Principal Life issued Brand a policy of disability income insurance bearing policy no. ***5773, with an issue date of January 15, 2012.

### Review and Evaluation of Medical Records after submission of Disability Claim Notice

27. On November 11, 2014, Brand executed a Disability Claim Notice seeking disability benefits. On the Disability Claim Notice, Brand stated he was disabled as of November 21, 2014, and provided the following "details of accident or nature of sickness:" "July 2014 a warrant was served but didn't know why - - extremely anxious but still working, until 11/21/14 when I was indicted and realized this was political & conspiracy & revenge by ex-employee who

I pressed charges against."

28. Brand submitted to Principal Life a Psychiatric Questionnaire executed by Catherine Zillmann, NPP, stating that his "chief complaint/symptoms" were as follows:

> "Have been treating Jason since 2012 for ADHD. Since June he has been unable to work due [sic] a criminal and civil court case. He is anxious, depressed, has marked difficulty sleeping and feels 'lost.'"

29. She further described the "stressful events occurring… about the same time as the onset of the symptoms" as follows "In June, the Attorney General raided his offices and took his computers and files. All of his assets were taken and he feels 'lost.'"

30. In response to Question 11 of the Psychiatric Questionnaire which asked if there were any unusual circumstances that contributed to Brand's conditions, Ms. Zillmann responded "He is unable to work because of the accusations against him and all of his assets have been ceased by the Attorney General's office." She advised that he would be able to work again part-time "when he finds work he can do," and full- time "when the court case is settled."

31. During the course of Principal Life's review and evaluation of Brand's medical records, Principal Life discovered that the representations and statements made on Brand's Application and the Amendment and Acceptance Forms for the Policy were materially false, Brand knowingly failed and omitted to disclose material facts, and otherwise knowingly failed to accurately, honestly and/or truthfully answer and disclose material information in response to the questions present on the Application which, if disclosed, Principal Life would have declined to issue to him the Policy.

32. Specifically, and by way of illustration only, Brand knowingly and intentionally made material misstatements of fact, failed, refused and/or omitted to disclose material facts and

8

otherwise failed to correctly answer and disclose the following information from his medical providers:

- On March 28, 2011, Brand sought treatment, consultation and/or examination from Dr. Stephen Mezzafonte, Interventional Cardiologist following an episode of headaches, confusion and difficulty speaking. Dr. Mezzafonte's office note from March 28, 2011, states that your current medications include Nortriptyline 25 mg daily, Crestor 10 mg daily, TriCor 145 mg daily, aspirin 81 mg daily and testosterone 200 mg every week. Dr. Mezzafonte's office note further states that Brand was newly diagnosed with hypertension and neurologic symptoms. Dr. Mezzafonte's office note states that Brand was being referred to Dr. Gerard Tepedino for further workup for secondary causes of hypertension.

- On April 28, 2011, Brand again sought treatment, consultation and/or examination by Dr. Mezzafonte for a follow-up. Dr. Mezzafonte's office note from this date states that Brand was recently seen by Dr. Tependino for renal insufficiency, and Brand was started on Lisinopril HCT. His office note further states that Brand was to follow-up with Dr. Tepedino for management of your renal disease.

- On July 26, 2011, Brand again sought treatment, consultation and examination from Dr. Mezzafonte for follow-up regarding hypertension, hyperlipidemia and mild chronic renal insufficiency. His office note states that Brand was stable from a cardiovascular standpoint.

- On October 18, 2011, Brand sought treatment, consultation and/or examination from Dr. Bruce Phillips. His records for that date state that Brand was on Lexapro 10 mg daily for depression and Ativan 2 mg as needed for anxiety.

- On February 11, 2011, Brand sought treatment, consultation and/or examination from Dr. Semih Gungor for back and neck pain. His record from that date states that Brand's current problems included cervical stenosis, cervicalgia, cervical radiculopathy, radiculopathy, lumbar/sacral/thoracic, other unspecified disorders of back lumbar region, back pain lumbar (lumbago) and back symptoms other. The Assessment section of Dr. Gungor's report states that he assessed Brand as having cervical stenosis, cervicalgia, cervical radiculopathy, radiculopathy lumbar region, and lumbago. His plan of treatment included a conditioning program and to continue with current medications. He noted that Brand had a pain management specialist in Long Island, and that Brand had cervical epidural injections and a trigger point injection on that day. Brand was to restart on Lyrica 75 tid and continue Nortriptyline. He also noted that Brand was doing better after the cervical epidural steroid injection for the neck pain.

9

- On April 1, 2011, Brand sought treatment, consultation and/or examination from Dr. Gungor for pain. The Assessment section of Dr. Gungor's report states an assessment of cervical stenosis, cervicalgia, cervical radiculopathy, radiculopathy, lumbar/sacral/thoracic, and lumbago. He recommended that Brand discontinue the Mobic as he had completed the course. His record further states that Brand had complaints of neck pain that interferes with activities of daily living and work and that Brand may want to consider a cervical epidural steroid injection (CESI) if needed. It was noted that Brand had right sided disc protrusions at C3-4 on the cervical MRI.

- On May 5, 2011, Brand again sought consultation, treatment and/or examination from Dr. Gungor for cervical and lumbar pain. His record from that date states that Brand should consider CESI for right sided disc protrusion at C3-4 on cervical MRI and that they may consider right C6-7 cervical epidural entry. His record also states that he discussed this with Brand, consent was obtained and a decision was made to proceed. His record from that date states Brand was to continue on Nortriptyline.

- On June 21, 2011, Brand again sought consultation, treatment and/or examination from Dr. Gungor. Dr. Gungor's record from that date states that Brand's diagnosis was right C6 cervical radiculopathy, that conservative treatment failed, and that on that date Brand underwent a right C6-7 intralaminar epidural steroid injection.

- Dr. Allan Stempler, Psychiatrist provided Principal Life with a summary of Brand's medical treatment and history. Dr. Stempler's summary states that Brand was first seen by him on July 19, 2011, with complaints of anxiety, panic, depressed mood, insomnia and poor appetite. He states that Brand's symptoms were chronic with various intensity, but had increased over the three months prior to your first visit with him. Brand was subsequently seen on a weekly basis for 24 visits with him with the final visit was April 18, 2012. Dr. Stempler states Brand's DSM-IV diagnosis was as follows:

  Axis I: Generalized Anxiety Disorder 300.02
  Axis II: Noncontributory
  Axis III: Noncontributory
  Axis IV: Family and Business Stress
  Axis V: GAF 70

  His summary states that Brand was treated with medication and insight-oriented psychotherapy. With respect to medications, his summary states that Brand was first treated with Cymbalta 30 mg then 60 mg which was poorly tolerated. It was replaced with Lexapro 10 mg which was effective for a number of months and then was changed to Pamelor 50 mg for additional benefit of reduction of anxiety

10

with psychosomatic symptoms. In addition, he states that Brand received Ativan 1 mg for the reduction of acute anxiety and insomnia which was changed to diazepam 5 mg for added reduction of muscle spasms. He noted that Brand was actively engaged in therapy and was responding to medication before Brand left therapy. Brand was never instructed about restrictions or limitations of functioning at that time.

- On November 3, 2009, Brand sought treatment, consultation and/or examination from Dr. Dexter Sun, Neurologist. The Impression section of Dr. Sun's report states that Brand has cervical radiculopathy and stiffness in the neck. The Plan section of the report states that Brand should have an EMG and MRI of the cervical spine.

- On November 18, 2009, Brand sought treatment, consultation and/or examination from Dr. Sun. His record from that date state that the MRI of the cervical spine showed a small annular bulge at the C3-4 level. Brand was given a prescription for physical therapy for the cervical radiculopathy.

- On December 10, 2009, Brand sought treatment, consultation and/or examination from Dr. Rose Marie Matthews for lower back and neck discomfort and headaches. Dr. Mathey's record from that date states that Brand's clinical impression was chronic pain syndrome. She further states that Brand had left paracentral disc protrusion at L5-S1 which is not causing significant compression or stenosis. There was also evidence of right lateral recess disc herniation at C3-C4, which is stable and not causing cord compromise or root impingement. Her record states that Brand had evidence of paracervical muscular spasm which is likely a contributing factor of Brand's headaches. It was noted that Brand's medications include: nortriptyline which Brand was tolerating well, and Brand should increase it to 50 mg q.h.s in two weeks. Brand was given a prescription for muscle relaxant Amrix 15 mg q.d. and Brand was referred to Jackie Caulfield for physical therapy.

- On January 12, 2010, Brand came under the care of Allen Millman, M.D., a pain specialist, with a chief complaint of neck pain and headaches. Following examination, Dr. Millman set forth a diagnosis of cervical disc displacement and cervicogenic headaches. Dr. Millman treated Brand by performing a series of cervical epidural steroid injections, which were administered on January 15, February 24, and April 2, 2010. Brand declined surgical management at that time, although the cervical epidural steroid injections did not relieve Brand's cervical pain and headaches.

- On March 23, 2011, Brand sought treatment, consultation or examination from Dr. Sun. His report states that Brand had an MRI of the brain due to blunt trauma to

11

the right eye. Dr. Sun's report states his impression was normal brain. It also stated that Brand had a cervical MRI. There is no neurophysiologic evidence of cervical radiculopathy on either side. There is no neurophysiologic evidence of a medical neuropathy at the wrist on either side.

- Catherine Zillmann, NPP provided a Psychiatric Evaluation dated November 20, 2012, stating that a year ago Brand had increased forgetfulness. Her assessment states that Brand tried Cymbalta, Lexapro 10 mg, Ativan 1 mg, Xanax, and Valium. Lexapro 10 mg about a year ago which helped with temper management.

- On August 15, 2011, Brand received treatment, consultation and/or examination from Dr. Brett Mellinger. He lists in his notes that Brand's medications included, *inter alia*, Cymbalta 20 mg.

- On January 20, 2012, Brand again sought treatment, consultation and/or examination from Dr. Mezzafonte. The Plan section of his report states that he will perform a repeat echocardiogram today as well as an EKG and that Brand will see him again in 6 months, or sooner if a new cardiovascular issues arise. Brand underwent an echocardiogram on that date and the conclusion section of the echocardiogram report states: left ventricular function is normal. There is concentric left ventricular hypertrophy. There is trace mitral regurgitation. Tissue Doppler analysis is consistent with abnormal left ventricular relaxation. Compared to the study of 4/3/2010 there is no significant change.

- Brand sought treatment, consultation and examination from Dr. Allan Stempler, a Psychiatrist, for complaints for anxiety, panic, depressed mood and anxiety, for which he was prescribed medication on July 19, 2011, July 25, 2011, August 11, 2011, August 18, 2011, August 23, 2011, September 1, 2011, September 6, 2011, September 15, 2011, September 22, 2011, September 29, 2011, October 13, 2011, October 20, 2011, November 3, 2011, November 10, 2011, November 17, 2011, December 1, 2011, December 8, 2011, January 4, 2012, January 19, 2012, February 2, 2012, February 7, 2012, February 9, 2012 and dates continuing thereafter to include February 16, 2012, March 8, 2012, March 15, 2012, March 22, 2012, April 18, 2012 and April 27, 2012.

- Dr. Stempler, a Psychiatrist, prescribed the following medications to Brand for the purposes of treatment of a generalized anxiety disorder: Cymbalta on August 11, 2011, August 18, 2011, August 23, 2011; Ativan and Cymbalta on September 22, 2011; Lexipro on September 29, 2011. Ambien and Ativan on November 17, 2011, Diazepam on December 1. 2011 and Pamelor on February 2, 2012.

- On February 1, 2012, Brand underwent an MRI scan of the thoracic spine which reported findings of right paracentral disc herniation causing moderate right canal

12

> stenosis at the T6-T7 level and right paracentral disc herniation causing moderate right lateral recess stenosis at the T7-T8 level.
>
> - On December 20, 2011, Brand underwent an MRI scan of the cervical spine.
>
> - On January 9, 2012, Brand underwent a colonoscopy, and on February 7, 2012, he presented himself in the offices of Dr. Rattner, North Shore Gastroenterology Associates, P.C., with complaints of rectal bleeding, change in bowel habits, nausea, vomiting and abdominal pain.

33. The representations and statements contained in Brand's response to Question 7a of Part A of the Application and in Brand's responses to Questions 18e, 18i, 22a, 22b and 23 of Part B of the Application which were acknowledged and accepted as true and complete by Brand on January 9, 2012, and again on February 8, 2012, were incomplete, inaccurate and false.

34. By letter dated June 29, 2015, Principal Life advised Brand that it formally declared the rescission, *ab initio*, the policy of disability income insurance bearing policy no. ***5773 and issued a check in the amount of $24,848.75, representing the return of all premiums theretofore paid plus interest.

## FIRST COUNT

35. Principal Life repeats and realleges the allegations contained in paragraphs 1 through 34 inclusive, as if the same were fully set forth at length herein.

36. As is set forth more fully in the preceding paragraphs, Brand knowingly and intentionally misrepresentations, concealed, and/or failed to disclose his complete medical history, his consultations with physicians, the diagnostic tests he underwent, the medical treatment he was advised to have, the medication he had been or currently was taking when he completed the Application seeking the issuance of policies of disability income insurance.

37. As is set forth more fully in the preceding paragraphs, Brand knowingly and

13

intentionally made material misstatements of fact in response to the questions present on the insurance Application, and otherwise failed, refused and/or omitted to disclose material facts, all of which is aforesaid.

38. Brand made false material representations of presently existing or past facts when he completed the Application seeking the issuance of policy of disability income insurance with the intent that they be relied upon.

39. Principal Life relied on the false material representations of Brand and issued the policy of disability income insurance bearing policy no. ***5573.

40. Principal Life has no adequate remedy at law and therefore seeks relief, i.e., that the policy of disability income insurance policy no. ***5573 be declared null and void and rescinded, *ab initio*.

**WHEREFORE**, Principal Life demands judgment against defendant for relief more particularly described as follows:

(a) An order declaring and adjudging the policy of disability income insurance policy no. 5573 to be null and void and rescinded, *ab initio*; and

(b) An order awarding prejudgment interest, post judgment interest, costs of suit, reasonable attorney fees and such other relief the court deems equitable and just.

## SECOND COUNT

41. Principal Life repeats and realleges the allegations contained in Paragraphs 1 through 40 inclusive, as if the same were fully set forth at length herein.

42. Annexed to the disability policy was Part C of the application executed by Brand on January 9, 2012, which provides, in material part:

14

> **AGREEMENT: Statements In Application(s):** I represent that all statements in this application(s) are true and complete to the best of my knowledge and belief and were correctly recorded before I signed my name below. I understand and agree that the statements in this application(s), including all of its parts, and statements by the Proposed Insured in any medical questionnaire(s) that becomes a part of this application(s), will be the basis of any insurance issued. I understand that material misrepresentations could mean denial of an otherwise valid claim and rescission of the policy during the contestable period.
>
> **When Coverage Becomes Effective:** I understand and agree that the Company shall incur no liability until: (1) a policy issued on this application(s) has been received and accepted by the owner and the first premium paid; and (2) at the time of such delivery and payment, the person to be insured is actually in the state of health and insurability represented in this application(s), medical questionnaire(s), or amendment(s) that becomes a part of this application(s); and (3) the Part D of the completed Application or the Delivery Receipt form, and any required Amendment and Acceptance or other forms are signed by me and the Proposed Insured (if different) and dated at delivery. If these conditions are met, the policy is deemed effective on the Policy Date stated in the policy. If the application was submitted COD (cash on delivery) or a request for a change in the Policy date is received, the Policy Date may be changed to the date coverage becomes effective and a new Data Page will be sent to the Owner.

43. The Section of the Disability Policy entitled **The Contract** provides, in material part:

> **Entire Contract.** The policy, the attached applications and any attached riders or endorsements make up the entire Contract.

44. On the date the Disability Policy was delivered and accepted and the first premium paid, Brand was not in a state of health and insurability represented in the applications.

45. Brand failed to satisfy the conditions precedent for coverage to be effective under the Disability Policy.

46. Principal Life has no adequate remedy at law and therefore seeks that the terms and provisions of the Disability Policy pertaining to the conditions precedent to the effectiveness

15

of coverage be specifically enforced.

**WHEREFORE**, Principal Life demands judgment against Brand for relief more particularly described as follows:

(a) An order specifically enforcing the conditions precedent to the effectiveness of coverage under and pursuant to the Disability Policy; and

(b) An order declaring and adjudging the Disability Policy was and is not effective, and is null and void and of no force and effect; and

(c) An order awarding prejudgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief as the Court deems equitable and just.

### THIRD COUNT

47. Principal Life repeats and realleges the allegations in Paragraph 1 through 46 inclusive, as if the same were fully set forth as length herein.

48. Brand was at all times relevant to the execution and submission of the Application seeking the issuance of the Disability Policy under a duty of honesty, good faith and fair dealing to immediately and forthwith advise Principal Life of any material change in Brand's insurability from that represented in the Application which may occur any time prior to the issuance, delivery and acceptance of the Disability Policy and payment of the first premium.

49. Brand intentionally and willfully failed, refused and/or neglected to disclose, inform or otherwise advise Principal Life that Brand's insurability materially changed from that represented on the Application prior to the issuance, delivery and acceptance of the Disability Policy and payment of the first premium.

50. Had Brand not intentionally and willfully failed, refused and/or neglected to

16

disclose, inform or otherwise advise Principal Life that Brand's insurability materially changed to obtain the Disability Policy, Brand would not have been able to obtain the Disability Policy.

51. As a direct and proximate result of Brand's breach of the duties of honesty, good faith and fair dealing, Principal Life issued the Disability Policy and has otherwise sustained damages.

52. Principal Life therefore seeks that the Disability Policy be declared null and void and rescinded, *ab initio*.

53. In the alternative, Principal Life seeks that the terms and provisions of the Disability Policy pertaining to the conditions precedent to the effectiveness of coverage be specifically enforced.

**WHEREFORE**, Principal Life demands judgment against Brand for relief more particularly described as follows:

(a) An order specifically enforcing the conditions precedent to the effectiveness of coverage under and pursuant to the Disability Policy; and

(b) An order declaring and adjudging that the Disability Policy was and is not effective given the material change in Brand's insurability from that represented and stated in the Application, thereby rendering the Disability Policy null and void and of no force and effect; and

(c) An order declaring and adjudging the Disability Policy to be null and void and rescinded, *ab initio*; and

(d) An order awarding prejudgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief as the Court deems equitable and just.

17

## FOURTH COUNT

53. Principal Life repeats and realleges the allegations in Paragraph 1 through 53 inclusive, as if the same were fully set forth as length herein.

54. The section of Disability Policy entitled **The Contract** provides, in material part:

**Fraud**

> Upon a judicial decision in a civil or criminal court that You and/or the Owner have committed fraud in obtaining this policy or the filing of a claim under this policy, we may void this policy.

55. Brand knowingly, willfully and/or intentionally made material misstatements of fact and/or failed to disclose material facts when applying the Disability Policy and when filing a claim seeking benefits under the Disability Policy, all of which are aforesaid.

56. Principal Life seeks that the terms and provisions of the Disability Policy entitled **Fraud** be specifically enforced and that the Disability Policy be declared null and void.

**WHEREFORE**, Principal Life demands judgment against Brand for relief more particularly described as follows:

(a) An order specifically enforcing the terms and provisions of the Disability Policy, and in particular the **Fraud** provision; and

(b) An order declaring and adjudging the Disability Policy null and void and of no force and effect; and

(c) An order awarding prejudgment interest, post-judgment interest, costs of suit, reasonable attorney fees and such other relief as the Court deems equitable and just.

McElroy, Deutsch, Mulvaney
& Carpenter, LLP
Attorneys for Plaintiff,
Principal Life Insurance Company

By: _____
Steven P. Del Mauro

Dated: January 25, 2019

19