UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PRINCIPAL LIFE INSURANCE COMPANY,

<div style="margin-left: 2em;">Plaintiff,</div>

              **REPORT AND**
              **RECOMMENDATION**
              15-CV-03804 (GRB) (JMW)

<div style="margin-left: 2em;">-against-</div>

JASON P. BRAND,

<div style="margin-left: 2em;">Defendant.</div>
-------------------------------------------------------------X

**WICKS,** Magistrate Judge:

    Plaintiff Principal Life Insurance Company commenced this action against Defendant Jason P. Brand seeking a declaratory judgment that Plaintiff properly rescinded Defendant's disability income insurance policy (the "Policy") based on Defendant's allegedly fraudulent material misrepresentations on his policy application.  (DE 219.)  In response, Defendant asserted counterclaims for breach of contract and breach of the implied covenant of good faith due to Plaintiff's failure to provide coverage for Defendant's disability as required by the policy.  (DE 276.)  Before the Court on referral from the Honorable Gary R. Brown are Plaintiff's and Defendant's respective motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the undersigned respectfully recommends that Plaintiff's motion be granted in part and denied in part, Defendant's motion be granted in part and denied in part, and that, accordingly, the amended complaint and amended counterclaims now be dismissed.[1]

---

[1] As discussed more fully *infra*, should the district court disagree with the undersigned's analysis of the applicability of the Policy's criminal activity provision, the undersigned alternatively recommends that the parties proceed to trial solely on Defendant's breach of contract counterclaim.

# I.  FACTUAL BACKGROUND[2]

## A.  Defendant's Relevant Medical History

In 2009, Defendant began experiencing cervical pain.  (DE 297-2 at 7.)  Multiple MRIs taken by East River Imaging, PC revealed a herniated disc with a flattening of the thecal sac in Defendant's cervical region.  (*Id.* at 7–8.)  Defendant sought and received treatment for his neck pain from numerous doctors, namely Drs. Gungor, Sun, Millman, Mathews, and Yu.  (*Id.* at 3.)  Over the course of his treatment, these doctors prescribed Defendant multiple prescription pain medications and had Defendant attend physical therapy.  (*Id.*)  Defendant's neck treatment also included multiple cervical epidural injections as a means of combating the pain.  (*Id.*)

On July 19, 2011, Defendant began receiving treatment from a psychiatrist, Dr. Allen Stemplar, because he was experiencing anxiety, panic, depressed mood, insomnia, and poor appetite.  (*Id.* at 12.) These symptoms were considered chronic, meaning they had existed for over a year.  (*Id.*)  Defendant attended twenty sessions with Dr. Stemplar, who diagnosed him with general anxiety disorder and treated him with insight-oriented psychotherapy and multiple medications.  (*Id.* at 12–13.)  Specifically, Dr. Stemplar prescribed Defendant Cymbalta, Ativan, Lexapro, Ambien, Diazepam, and Pamelor in hopes of treating his anxiety.  (*Id.* at 14.)  Dr. Stemplar made sure to describe each medication to Defendant and explained why he was prescribing it.  (*Id.*)

## B.  Defendant's Application for Disability Insurance

In September 2011, while being treated for both cervical pain and anxiety, Defendant began searching for disability insurance through his broker, David Glenn.  (*Id.* at 16.)  Defendant expressly sought a policy that did not exclude coverage for cervical conditions.  (*Id.* at 4.)  Defendant had previously purchased life insurance through Glenn, who works as an independent contractor for Rampart Insurance under his limited liability company, Charter Trade Credit.  (*Id.*)

---

[2] The following facts are drawn from the Plaintiff's Statement (DE 297-2) and Defendant's Statement (DE 300-31) pursuant to Local Rule 56.1, as well as other evidence found in the record of this action, *see Ayazi v. United Fed'n of Teachers Loc. 2¸* 487 F. App'x 680, 681 (2d Cir. 2012) ("[W]hen assessing a summary judgment motion, a District Court may consider other materials in the record.") (internal quotation marks and citation omitted).

On September 9, 2011, Glenn emailed Lee Ganz—a disability insurance specialist at Rampart—to inquire about disability insurance for Defendant.  (*Id.*)  Glenn, using the health information he received from Defendant, explained that Defendant had "[h]ealth issues," including "[s]lightly elevated cholesterol history controlled with meds, slight anxiety using very low dose med . . . , slightly elevated blood pressure, no longer an issue."  (*Id.* at 16–17.)  Two days later, a disability consultant at Rampart, Frank Johnston, asked Glenn what caused Defendant's anxiety and how long he had been on medication, to which Glenn responded: "Only in the last 30–60 days, just work, family, life in general . . . . He was going through a lawsuit as well[.]"  (*Id.* at 17.)  After Johnston informed Glenn that Defendant would "be a decline with all of [their] traditional carriers until he [was] stable on the meds for at least one-year [*sic*]," the following email exchange occurred:

| | |
|---|---|
| Glenn: | What if he goes off the meds? |
| Johnston: | Still a one-year wait.  It is just not enough time to know if the meds are working and to be certain he would not need them again very shortly. |
| Glenn: | He's actually taking Cymbalta now for nerve pain he was taking Nortriptyline as well for nerve pain well over a year ago and switched to Cymbalta recently. |
| Johnston: | So does he have an anxiety/depression issues?  Do we have any info on the nerve pain? . . . |
| Glenn: | I guess not, he was prescribed the meds by a neurologist.  Please of back up [*sic*].  He has had back issues for a while. |

(*Id.* at 17–18.)  That same day, Glenn forwarded his email thread with Johnston to Defendant.  (*Id.* at 18.)

On January 6, 2012, Glenn sent Defendant a blank application for disability insurance through Plaintiff and advised Defendant to disclose any medication that he had taken or was currently taking.  (*Id.* at 21.)  Part A of the application asked:

> Within the last five years, have you been treated for, or been diagnosed as having a heart condition, chest pain, stroke, *back or neck problem*, sleep disorder, *psychological condition (including but not limited to, counseling from mental health or substance abuse provider, and/or psychotherapist)*, cancer, diabetes, alcohol abuse, or drug dependency?

(*Id.* at 22 (emphasis added).)  While Defendant checked "*yes*" to this question, he explained in the details section that he had "back surgery lower lumbar spine 2009 herniated dis[c]."  (*Id.*)  When asked whether

3

he had, in the last ten years, been treated for or been diagnosed as having "chronic fatigue, stress, depression, anxiety or any other emotional or psychological disorder," Defendant checked "*no*," but explained that he had "Hypertension – on medication – Toprol XL 25 mg 1x day." (*Id.*)  When asked whether he had, in the last ten years, been treated for or been diagnosed as having "back or neck pain, disc problems, spinal sprain or strain, sciatica, arthritis, carpal tunnel syndrome, or any other disease or disorder of the bones, joints or muscles," Defendant checked "*yes*" and explained that he "had lumbar dis[c] surgery [in] 2009." (*Id.*)  Finally, Defendant answered "*no*" when asked whether, in the last ten years, he had any "medical tests . . . illness or injury," if he had "consulted a doctor, psychiatrist, or other healthcare provider not provided in response to a previous question," or if he had "been advised to take any medication or treatment not provided in response to a previous question." (*Id.* at 23 (capitalization altered).)  On January 9, 2012, Defendant executed the application, certifying that his responses were true and correct and acknowledging that the policy would not become effective unless he was in the same state of health as represented on the application and that any knowledge of his broker, Glenn, could not be imputed onto Plaintiff. (*Id.* at 23–24.)

After receiving the application, Plaintiff conducted a phone interview with Defendant. (*Id.* at 24.) When asked whether he had consulted a doctor, clinic, emergency room, or other health care provider in the prior three years, Defendant answered "*yes, Steven Goldberg*," for a physical with no follow-up treatment. (*Id.*)  Defendant only disclosed Crestor, Tricor, and Lisinopril—cholesterol medications—when asked if he was currently under any medication or treatment. (*Id.*)  In response to questions regarding his back pain, Defendant stated that he began experiencing lower back pain in 2008 and that he received treatment for his herniated lumbar disc and discectomy from a Dr. Gamache. (*Id.* at 25.)  As with his initial application, Defendant did not disclose that he received treatment from Drs. Gungor, Sun, Millman, Mathews, and Yu for his cervical issues, and did not mention that he received epidural injections for his neck pain. (*Id.*)  When asked whether he had "consulted a counselor/therapist for any reason such as stress, anxiety[,] or depression," Defendant responded "*no*." (*Id.*)

4

On February 1, 2012, Plaintiff advised Defendant that it would approve his disability coverage with an exclusion for the lumbar spine.  (*Id.*)  Coverage would be for a $18,250 a month benefit.  (*Id.* at 28.) There are key relevant terms under the Policy which must be referenced in determining the instant dispute. They are:

> **TOTAL DISABILITY** – means solely due to injuries or sickness: During the Your Occupation Period you are unable to perform the substantial and material duties of your occupation and you are not working . . . . If you are unemployed, total disability means, solely due to injury or sickness, you are prevented from obtaining a job that you are reasonably suited to by your education, training and experience.

(*Id.* at 28 (capitalization altered).)  The Policy also includes a host of exclusions, stating, in pertinent part:

> **EXCLUSIONS**
> This policy does not pay benefits for an injury or sickness which in whole or in part is caused by, contributed to by, or which results from: . . . . 2. Your commission of or your attempt to commit a felony, or your involvement in an illegal occupation[.]

(*Id.* at 29 (capitalization altered).)  Further, the Policy permits Plaintiff to rescind the agreement as follows:

> **TIME LIMIT ON CERTAIN DEFENSES**
> In issuing the coverage(s) under this policy and any attached riders, we have relied on the statements and representations on the application. We have the right to void the coverage(s) due to a material misstatement or omission in the application.  However, after two years from the effective date of coverage(s), no material misstatements or omissions, except fraudulent statements or omissions, made by you or the owner in an application will be used to void the coverage(s) or deny a claim for disability which starts after the expiration of such two-year period . . . No claim for disability or loss covered by this policy or any attached riders starting after two years from the date coverage has been in effect will be reduced or denied because a sickness or injury existed before the effective date of coverage(s) unless the condition is excluded by name or description. Sickness or injury fully disclosed on the application(s) will be covered, unless excluded by name or description.
>
> **FRAUD**
> Upon a judicial decision in a civil or criminal court that you and/or the owner have committed fraud in obtaining this policy or the filing of a claim under this policy, we may void this policy.

(*Id.* at 30 (capitalization altered).)

### C.  Defendant's Criminal Proceedings

In June 2014, the New York State Attorney General's office raided Defendant's offices and confiscated his computers and physical files.  (*Id.* at 40.)  On October 16, 2014, Defendant, his father, and two of their companies—DASO Development Corp. and Narco Freedom, Inc.—were indicted for insurance fraud in the first degree and grand larceny in the second degree.  (*Id.* at 41.)  An Order of Attachment was issued on October 20, 2014, which froze the bank accounts of Defendant, DASO Development Corp., and Narco Freedom, Inc.  (*Id.* at 41.)  On March 13, 2015, a superseding indictment was issued, alleging that:

- [Defendant] and the Brand Criminal Enterprise secretly owned and controlled the vendors that sold products and support services to Narco Freedom.  These "Related Entities" included [Defendant's] companies DASO Development, B&C Management, Superb Security, Inc., Superior Maintenance d/b/a 1 Stop Medical Supply, Inc., DASO Cleaning and Restoration Inc. and Unique Auto Group, Inc.

- The Brand Criminal Enterprise siphoned money through a variety of scams including, but not limited to: 1) no show job scams; 2) shell company scam whereby [Defendant] submitted false invoices to Narco Freedom through Related Entities such as B&C Management and received funds for services that were never provided; (3) a fake invoice scam whereby [Defendant] and Related Entities such as DASO Development, submitted false invoices to Narco Freedom for services that were never provided; a vehicle scam and a kickback scam.

(*Id.* at 43.)

On February 8, 2016, Defendant entered into a plea agreement and admitted to committing, in connection with his businesses, the crimes of enterprise corruption, insurance fraud in the first degree, and grand larceny in the second degree.  (DE 297-9 at 90.)  Defendant admitted to, among other things, "control[ing], manag[ing] and operat[ing] . . . substance abuse programs," including Narco Freedom, Inc., "to obtain money and enrich themselves by deceiving regulatory agencies" by "hiding the true ownership and control of related entities," such as DASO Development Corp., "that contracted with Narco Freedom for goods and services."  (*Id.* at 96.)  DASO Development Corp. also pled guilty to enterprise corruption. (DE 297-2 at 47.)

### D.  Defendant's Disability Claim

On November 11, 2014, Defendant executed a Disability Claim Notice seeking disability benefits under the Policy.  (DE 297-3 at 52–55.)  Defendant claimed to be totally disabled due to "extreme anxiety," which began "after a warrant was served."  (*Id.* at 52.)  Defendant listed his employers as DASO Development Corp. and Narco Freedom, Inc.  (*Id.* at 53.)

After receiving the Disability Claim Notice, Plaintiff reviewed and evaluated Defendant's claim.  (*See, e.g.*, DE 297-2 at 30–31; DE 300-31 at 8–9.)  Following its investigation, Plaintiff advised Defendant that it was formally rescinding the Policy and issued Defendant a check for $24,848.65, covering the return of all premiums paid plus interest.  (DE 297-2 at 31.)  Specifically, Plaintiff informed Defendant that it "found significant discrepancies between the information [he] provided on [his] application for disability income insurance and the information [it] received during [its] evaluation of [his] claim," and that the discrepancies, in Plaintiff's view, "demonstrate[ed] that [Defendant] made fraudulent statements and omissions when [he] applied for the disability income insurance."  (DE 300-17 at 1.)  Plaintiff rescinded the Policy without first obtaining a judicial determination that Defendant committed fraud.  (DE 300-31 at 10.)

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on June 30, 2015.  (DE 1.)  Defendant—proceeding *pro se* for a vast majority of the proceedings—filed an answer on October 13, 2015.  (DE 22.)  In his answer, Defendant asserted counterclaims for breach of contract and "bad faith."  (*Id.* at 10–14.)  Plaintiff answered Defendant's counterclaims on November 11, 2015.  (DE 25.)  Plaintiff subsequently filed an amended complaint on June 10, 2019 (DE 219), to which Defendant answered on April 14, 2020, asserting amended counterclaims (DE 276).  Plaintiff filed an answer to those counterclaims on April 23, 2020.  (DE 277.)  After a tumultuous period of discovery—in which Defendant, without the benefit of counsel, incessantly filed inappropriate motions and letters with the Court—Defendant, on the eve of dispositive motion practice, retained counsel.  (DE 273.)

Both parties now move for summary judgment on all claims.  (DE 297, 300.)  On July 9, 2021, Judge Brown referred these motions to the undersigned for a Report and Recommendation.  (Electronic Order dated July 9, 2021.)  On August 16, 2021, the Court heard oral argument from the parties and reserved its decision for the present Report and Recommendation.  (DE 302.)

### III.    THE APPLICABLE LEGAL STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim.  *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).  The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact, *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

In considering multiple motions for summary judgment, "the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Quanta Lines Ins. Co. v. Investors Cap. Corp.*, No. 06–civ–4624, 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) (citing *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment)).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

With these guiding principles in mind, the Court considers the cross-motions for summary judgment.

## IV.   <u>ANALYSIS</u>

### A.  **Plaintiff's Recission Claims**

Needless to say, the parties espouse vastly differing interpretations of the Policy regarding Plaintiff's ability to rescind.  Defendant contends that Plaintiff's recission claims must fail because the Policy's Fraud provision mandates a judicial finding of fraud before Plaintiff may rescind the coverage for fraudulent misrepresentations.  That is, a judicial decree or formal finding of fraud is a precondition to such claim.  In Plaintiff's view, the Time Limits on Certain Defenses provision permits recission solely on Plaintiff's own determination of fraud.  Said differently, Plaintiff interprets the Fraud provision as being a separate, stand-alone broader provision which captures other instances of fraud not contemplated by the Time Limits on Certain Defenses provision.

"Insurance policies are contracts and are therefore interpreted according to the rules of contract interpretation." *Frazer Exton Dev., L.P. v. Kemper Env., Ltd.*, 153 F. App'x 31, 32 (2d Cir. 2005) (summary order); *see World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 183–84 (2d Cir. 2003); *In re Covert*, 97 N.Y.2d 68, 76, 761 N.E.2d 571, 576–77, 735 N.Y.S.2d 879 (2001) ("Insurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation") (citations and internal quotation marks omitted).  Thus, in a dispute over the meaning of an insurance policy provision, the threshold question is whether the provision at issue is ambiguous.  *Great Minds v. FedEx Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018); *see also Certified Multi-Media Sols., Ltd. v. Preferred Contractors Ins. Co. Risk Retention Grp.*, LLC, 674 F. App'x 45, 47 (2d Cir. 2017) (summary order) ("The initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties"); *In re Lehman Bros. Holdings Inc.*, 761 F.3d 303, 309 (2d Cir. 2014) ("After giving all the terms of a contract their plain meaning . . . we determine whether language in a contract is ambiguous").

In assessing ambiguity, courts must look at the terms provided within the four corners of the policy rather than outside sources. *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011); *see also In re MPM Silicones, L.L.C.*, 874 F.3d 787, 795 (2d Cir. 2017) ("The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous"). An ambiguity exists where the terms of the policy "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks omitted); *see Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir.1998) ("As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading"); *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (noting that courts "do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole"). On the other hand, "[a]mbiguity is absent where the contract's language provides a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012); *accord Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019); *see Hansard v. Fed. Ins. Co.*, 147 A.D.3d 734, 736, 46 N.Y.S.3d 163, 166 (2d Dep't 2017).

Notably, parties coming forward with differing interpretations of the policy does not necessarily result in a finding of ambiguity. *See Olin Corp.*, 704 F.3d at 99 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation"); *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680, 37 N.E.3d 78, 16 N.Y.S.3d 21 (2015) ("[P]arties cannot create ambiguity from whole cloth where none exists, because provisions are not ambiguous merely because the parties interpret them differently"). Rather, "the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Universal Am. Corp.*, 25 N.Y.3d

10

at 680 (internal quotation marks and citation omitted); *see DeMoura v. Cont'l Cas. Co.*, 20-CV-2912 (NGG) (SIL), 2021 WL 848840, at *4 (E.D.N.Y Mar. 5, 2021).  Under New York law, if the terms of a policy are indeed ambiguous, that the ambiguity must be construed in favor of the insured and against the insurer. *General Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 462 (E.D.N.Y. 2015) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267, 878 N.E.2d 1019, 848 N.Y.S.2d 603 (2007)).

The Court finds as a matter of law that the Policy unambiguously requires—after being in effect for over two years—a judicial finding of fraud before Plaintiff may be permitted to rescind the policy based on fraudulent misrepresentations.  The Time Limit on Certain Defenses provision provides that "after two years from the effective date of coverage[] . . . fraudulent statements or omissions . . . made by [Defendant] in an application will be used to void the coverage[] or deny a claim."  (DE 297-3 at 21.)  The Policy goes on, under the Fraud provision, to provide that "[u]pon a judicial determination in a civil or criminal court that [Defendant] ha[s] committed fraud *in obtaining this policy* or filing a claim under the Policy, [Plaintiff] may void this policy."  (*Id.* (emphasis added).)  Read together, the plain meaning of these provisions is clear:  Plaintiff will use Defendant's fraudulent statements or omissions, to the extent they exist, to void the Policy at any time after two years past the effective date, but it may only do so following a judicial determination that Defendant has committed fraud.  Indeed, Black's Law Dictionary defines the verb "may" as "[t]o be permitted to."  *May*, *Black's Law Dictionary* (11th ed. 2019).  Plaintiff is therefore "permitted to" void the Policy based on fraudulent misrepresentations upon a judicial determination that Defendant has committed fraud in obtaining the Policy.  The inverse, of course, is that Plaintiff is not "permitted to" void the Policy absent such a determination.  Defendant has offered no authority or evidence to the contrary. In light of this Policy language, the Court concludes that the "reasonable expectation[] of the average insured upon reading th[is] policy and employing common speech" is that Plaintiff cannot rescind the Policy on the basis of fraud without first obtaining a judicial determination that such fraud exists.  *Universal Am. Corp.*, 25 N.Y.3d at 680 (internal quotation marks and citation omitted).  The Policy is unambiguous in that regard.

Plaintiff's arguments to the contrary are unpersuasive.  In short, Plaintiff asserts that the Policy unambiguously allows for recission without a judicial finding of fraud.  (DE 297-13 at 6.)  More specifically, Plaintiff contends that "the broader Fraud provision, which is purely contractual,"—as opposed to the statutorily mandated Time Limits provision—merely "permits recission for *other* fraudulent acts upon a judicial finding," such as instances where "an insured's claim is judicially determined to be fraudulent."  (*Id.* (emphasis added).)  The Court agrees that the Fraud provision is broader in scope than the Time Limits provision in that it permits Plaintiff to rescind the Policy for fraudulently submitted claims. That, however, tells only half the story.  As noted above, the Fraud provision also states that Plaintiff may void the Policy upon a judicial determination that Defendant has "committed fraud *in obtaining the policy*." (DE 297-3 at 21 (emphasis added).)  Plaintiff having the ability to rescind the Policy based on the Time Limits provision and without a judicial finding of fraud would render the "in obtaining the policy" language in the Fraud provision meaningless, weighing heavily against that being the appropriate interpretation.  *See Madelaine Chocolate Novelties v. Great N. Ins. Co.*, 399 F. Supp. 3d 3, 9 (E.D.N.Y. 2019) ("In determining whether a policy is ambiguous, an interpretation that 'ha[s] the effect of rendering at least one clause superfluous or meaningless . . . is not preferred[.]'") (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)).  It is telling that Plaintiff fails to—and cannot, as a matter of contractual interpretation—provide an example of when the "broader" Fraud provision would permit recission for fraud in obtaining the Policy where the Time Limits provision would not.

Plaintiff also points to the Hobson's choice it faces under Defendant's interpretation of the Policy provisions.  Specifically, Plaintiff avers that such an interpretation is unworkable because Defendant would be required to pay premiums pending the judicial determination of fraud and, under New York law, "acceptance of premiums after determining there is evidence to rescind and filing a lawsuit waives the right to rescind."  (DE 297-13 at 6 (citing *U.S. Life Ins. Co. v. Blumenfeld*, 92 A.D.3d 487, 489–90, 938 N.Y.S. 2d 84 (1st Dep't 2012).)  Although this certainly places Plaintiff between the proverbial rock and a hard place, it is well understood that a "party who executes a contract is considered bound by the terms of that contract."  *Sidney v. Verizon Comms.*, 17 CV 1850 (RJD) (RLM), 2018 WL 1459461, at *2 (E.D.N.Y. Mar.

23, 2018) (internal quotation marks and citations omitted).  Fully aware of its terms, Plaintiff agreed to be bound by the Policy and cannot now retroactively raise concerns about the practicality of the agreed-upon provisions.  In any event, the Court would be required to look past the plain meaning of the Policy to "sources outside of the text of the contract" to entertain this argument, which it need not, and cannot, do given its determination that the Policy is unambiguous.[3]  *In re MPM Silicones, L.L.C.*, 874 F.3d at 795.

In sum, the Court finds that, because there has been no judicial finding of fraud, Plaintiff is not entitled to rescind the Policy.  Accordingly, the undersigned respectfully recommends that Plaintiff's motion for summary judgment as to its recission claims be denied, and that Defendant's motion for summary judgment seeking dismissal of Plaintiff's recission claims be granted.

## B.  Defendant's Breach of Contract Claim

Defendant next contends that there is no genuine issue of material fact that Plaintiff breached the Policy by refusing to pay him disability benefits and that he is therefore entitled to summary judgment on his breach of contract counterclaim.  (DE 300-1 at 17–18.)  Plaintiff counters that it is entitled to summary judgment on Defendant's breach of contract counterclaim because: (1) Defendant is excluded from collecting benefits under the Policy because his disability stems from running a criminal enterprise; and (2) even assuming the criminal activity exclusion is inapplicable, Defendant has not satisfied his burden of proving that he is "totally disabled" as defined by the Policy.

---

[3] The Court notes that, even if the Time Limits provision and Fraud provision, read together, renders the Policy reasonably susceptible to more than one meaning and thus ambiguous, that ambiguity would be construed in favor of Defendant and against Plaintiff, leading to the same outcome—namely that the absence of a judicial finding of fraud precludes Plaintiff's ability to rescind.  *Driven Sports, Inc.*, 80 F. Supp. 3d at 462 (citation omitted).

### i.    Criminal Activity Exclusion

The Policy contains an exclusionary provision for criminal activity, stating: "This policy does not pay benefits for an injury or sickness which in whole or in part is caused by, contributed to by, or which results from: your commission of, or your attempt to commit a felony, or your involvement in an illegal occupation."  (DE 297-3 at 14 (capitalization altered).)  In New York, the insurer bears the burden of establishing that a claim falls within the scope of an exclusion and is therefore not covered by the policy at issue.  *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 165 (2d Cir. 2011).  To successfully "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115–16 (2d Cir. 1996) (citation omitted); *see also Weaver v. Axis Surplus Ins. Co.*, No. 13-CV-7374 (SJF) (ARL), 2014 WL 5500667, at *16 (E.D.N.Y. Oct. 30, 2014).

There is no genuine dispute of material fact that Defendant's claimed disability was caused—in part, if not in whole—by his commission of a felony.  It is undisputed that in June 2014—prior to the submission of Defendant's disability claim on November 14, 2014—the New York State Attorney General's office raided Defendant's offices, seizing his computers and physical files, leading to the indictment on October 16, 2014 of Defendant and his businesses, DASO Development Corp. and Narco Freedom, Inc., for insurance fraud in the first degree and grand larceny in the second degree.  (DE 300-32 at 55–56.)  Defendant ultimately pleaded guilty to these charges.  (*Id.* at 63.)  The record makes clear that the commencement of those criminal proceedings—which resulted from his commission of multiple felonies—caused, or at least exacerbated, Defendant's mental health issues.  As a result of the raid, Defendant began feeling "depressed . . . paranoid and . . . worried that [someone was] listening on his cell phone."  (*Id.* at 66.)  Defendant stopped sleeping and eating well and began biting his hands.  (*Id.*)  Indeed, it is undisputed that Defendant's psychiatric nurse practitioner, Ms. Zillmann, diagnosed Defendant with major depressive anxiety disorder stemming from Defendant's arrest, indictment, and asset seizure.  (*Id.* at 65, 67.)  Even on his disability insurance claim form, Defendant stated that he was totally disabled due to

"extreme anxiety," which began "after a warrant was served." (*Id.* at 8.) This undisputed evidence demonstrates that Defendant's claimed disability was caused, at least in part, by his commission of a felony, and therefore is excludable under the Policy.

Relatedly, it is also undisputed that Defendant's involvement in his illegal businesses contributed to the onset of his claimed disability, thereby establishing a separate cause for excluding Defendant's disability. The record is replete with evidence that Defendant's business, DASO Development Corp., was an illegal enterprise. As noted above, that entity was indicted for insurance fraud and grand larceny. (*Id.* at 56.) In his plea agreement, Defendant admitted that:

> . . . he, his co-conspirators and other named and unnamed members of the Brand Criminal Enterprise controlled, managed and operated . . . substance abuse treatment programs to obtain money and enrich themselves by defrauding Medicaid and other insurers and by deceiving regulatory agencies. [Defendant] admits that he and his co-conspirators and others accomplished this . . . by hiding the true ownership and control of related entities within the Brand Criminal Enterprise [from government agencies]; specifically, [Defendant] admits that the Brand Enterprise failed to disclose true ownership and control of entities that contracted with Narco Freedom for good and services, specifically NF Maintenance, DASO Development, B&C Management Services, Inc., Superb Security, Inc., DASO Cleaning and Restoration, Inc., and Unique Auto Group, Inc., all of which were owned by members of the Brand Criminal Enterprise.

(DE 297-9 at 95–96.) Indeed, DASO Development Corp. ultimately pled guilty to enterprise corruption. (DE 297-2 at 47.) And, as previously mentioned, the unearthing of these criminal enterprises, leading to his criminal prosecution, caused Defendant to become totally disabled due to the extreme anxiety he developed "after a warrant was served." (DE 300-32 at 8.) Thus, Defendant's involvement in these illegal occupations, at minimum, contributed to his claimed disability, thereby triggering the criminal enterprise exclusion under the Policy.

Defendant's contentions to the contrary are misplaced. Although Defendant concedes that he "pled guilty to specific and discrete instances of criminal conduct in connection with one of his businesses," he nonetheless contends that "it would be an utter and complete mischaracterization to say that [his] only pre-disability occupation was running a criminal enterprise." (DE 301 at 6.) Defendant goes on to describe, *ad nauseum*, the non-criminal duties he performed in running his businesses, such as "completing construction work for medical build outs, interior remodels, apartments, government jobs and ground up

15

builds including renovations for both commercial and residential property," among other things. (*Id.* at 8–9.)  Even assuming that certain aspects of Defendant's pre-disability vocations were legitimate, the Policy does not demand that every facet of the insured's occupation be criminal to trigger exclusion; rather, it plainly excludes any disability which is caused by, or contributed to by, mere *involvement* in an illegal occupation.  It is undisputed that Defendant was involved in an illegal occupation, which, at the very least, contributed to the onset of his claimed disability.

Accordingly, the undersigned respectfully recommends that the district court find that Defendant's claimed disability is excludable under the Policy and that summary judgment be granted in favor of Plaintiff as to Defendant's breach of contract claim and that Defendant's motion for summary judgment thereof be denied.

### ii.    Total Disability

In light of the foregoing recommendation, the Court need not consider whether Defendant is suffering from a "total disability" within the meaning of the Policy.  However, since this was referred to the undersigned for a Report and Recommendation, the undersigned will nevertheless proceed to address the parties' "total disability" arguments in the event the District Judge concludes otherwise on the above recommendation.  The "total disability" arguments are two-fold:  *first,* whether the Social Security Disability Insurance determination ("SSDI determination") is admissible evidence, and *second,* whether genuine issues of material fact exist as to whether Defendant sustained a "total disability" under the Policy.

### a.    Admissibility of the Social Security Disability Insurance Determination

As an initial matter, the parties vehemently dispute whether the Court should consider the Social Security Disability Insurance determination (the "SSDI determination") submitted by Defendant in support of his disability claim.  Plaintiff has moved to strike this evidence because: (1) the determination—and therefore none of the experts relied upon in the determination—was not identified by Defendant in its Rule 26 disclosures; and (2) in any event, the determination would be inadmissible at trial—and therefore should not be considered here—because it is hearsay, irrelevant, and not probative of Defendant's disability.  (DE 297-13 at 4–5; *see* DE 297-14 at 3–5; DE 303.)  Defendant asserts that Plaintiff's failure to disclose as

experts the witnesses that the determination relies on was harmless and substantially justified and that the determination is relevant to whether Defendant is totally disabled under the policy and admissible.  (DE 300-33 at 3; *see* DE 304.)

Under Federal Rule of Civil Procedure 37, a party that fails to disclose information or identify a witness as required by Federal Rule Civil procedure 26(a) and (e) "is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  Such preclusion is meant "to prevent the 'sandbagging' of an opposing party with new evidence."  *Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alientari S.P.A.*, No. 08-cv-2540, 2011 WL 1239867, at *4 (E.D.N.Y. Mar. 30, 2011) (citations omitted); *see Lopez v. City of N.Y.*, No. 11–CV–2607 (CBA)(RER), 2012 WL 2250713, at *1 (E.D.N.Y. June 15, 2012) (noting that "[t]he combined purpose of [Rules 26 and 37] is to avoid surprise or trial by ambush") (citation omitted).  As such, in the "absence of prejudice" to the complaining party, courts have allowed the admission of "harmless" evidence. *BF Advance, LLC v. Sentinel Ins. Co., Ltd.*, 16-CV-5931 (KAM)(JO), 2018 WL 4210209, at *6 (E.D.N.Y. Mar. 20, 2018) (citing *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012)).  "In deciding whether to exercise its discretion to preclude evidence submitted in violation of Rule 26(a), the court considers: (1) [the party's] explanation for their failure to comply with the disclosure requirement; (2) the importance of the testimony of the potentially precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  *Id.* (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

On balance, the above factors weigh against striking Defendant's SSDI determination for failure to disclose the determination during discovery.  As to the first factor, the Court disagrees with Defendant's proffered excuse for failing to disclose the SSDI determination to Plaintiff.  Although Defendant proceeded *pro se* for a majority of this case, his counsel—Todd D. Kremin—filed a notice of appearance on March 18, 2020 (DE 273), well over a year before the present motions were filed and nearly nine months before discovery closed, (*see* Electronic Order dated June 29, 2020).  While, as stated in Defendant's reply,

"[Defendant] lacked the understanding that Rule 26(e) imposes a continuing delay on the parties to supplement [Rule 26] disclosures when additional information becomes available," it appears that defense counsel, based on his failure to disclose the SSDI determination upon appearing in this case, similarly may lack familiarity with Rule 26.  (DE 300-33 at 4 (citing Fed. R. Civ. P. 26(e)(1)(A)).)  Therefore, the first factor weighs in favor of striking the evidence.

Weighing the following two factors, however, tells a different story.  The SSDI determination is the gravamen of Defendant's disability argument.  Indeed, it is the *only* evidence Defendant relies on in contending that he is totally disabled under the Policy.  (*See, e.g.*, DE 300-1 at 17–18; DE 300-33 at 9.) The evidence is thus key to Defendant's case, weighing against preclusion.  Moreover, Plaintiff will not be prejudiced by the introduction of this evidence—or be subjected to "trial by ambush"—because Defendant filed the SSDI determination with the Court approximately five years ago, affording Plaintiff an abundance of time to obtain the determination and prepare for Defendant's arguments in reliance of it.  (*See* DE 63-2 at 59–62; *see also Lore v. City of Syracuse*, No. 5:00-CV-1833, 2005 WL 3095506, at *2 (N.D.N.Y. Nov. 17, 2005) ("While it may be true that plaintiff failed to adhere to the letter of the discovery rules, the court is convinced that defendants were sufficiently aware of the existence and relevance of the persons in question so that defendants are not being subjected to trial by ambush.").

Because these factors, on balance, suggest that Defendant's failure to disclose the SSDI determination was ultimately harmless, the undersigned recommends that this evidence not be stricken for failure to comply with Rule 26.  That, however, does not end the inquiry.  Rather, it is only the threshold question.

As noted above, Plaintiff also contends that the SSDI determination evidence is inadmissible and therefore should not be considered by the Court.  Specifically, Plaintiff argues that the SSDI determination "has little relevance and is highly prejudicial" and, in any event, is inadmissible hearsay.  (DE 303 at 1.) Defendant counters that the SSDI determination is relevant and probative to the issue of Defendant's disability because it applied a "more rigid definition [of total disability] than in the [policy]" and that, while the policy is a hearsay statement, the public records exception renders it admissible.  (DE 304 at 1–2.)

Federal Rule of Evidence 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The Second Circuit has characterized the relevance threshold as being "very low."  *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)).  Even if evidence is relevant, a district court may nonetheless exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see Old Chief v. United States*, 519 U.S. 172, 184–85 (1997) (discussing the contours of Rule 403).

The SSDI determination is relevant and not excludable under Rule 403.  Although the SSDI determination analyzes disability under a different—and, as Defendant points out, arguably more stringent—standard than the Policy, whether Defendant is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment"[4] unquestionably bears on whether he can perform substantial and material duties as stated in the Policy.  Said differently, the SSDI determination has a tendency to make Defendant's disability more or less probable and is therefore relevant.  Fed. R. Evid. 401; *cf. McElgunn v. CUNA Mut. Grp.*, CIV. 06-5061-KES, 2009 WL 1514398, at *8 (D.S.D. May 27, 2009) (holding that entitlement of social security benefits was relevant to the question of whether claimant was totally disabled under the insurance policy in question).

Moreover, the Court finds that the probative value of the SSDI determination is not substantially outweighed by unfair prejudice so as to warrant exclusion.  As previously noted, the SSDI determination is the *only* evidence that Defendant relies on to counter Plaintiff's arguments—this alone increases the probative value of the determination.  *See Ali v. Police Officer William Connick*, 11-CV-5297 (NGG) (VMS), 2016 WL 3080799, at *5 (E.D.N.Y. May 31, 2016) (finding evidence as highly probative when it was the only evidence plaintiff could rely on).  And while, as Plaintiff points out, the SSDI determination

---

[4] 42 U.S.C. § 423(d)(1)(A) (defining disability under the Social Security Administration (the "SSA")).

is the product of a non-adversarial proceeding, thereby arguably lessening its probative value, a district court may nonetheless "act[] well within its discretion when it consider[s] the SSA's findings as *some* evidence of total disability . . . even though the SSA's definition of disability may differ from that" in the policy at issue. *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (emphasis added). Indeed, in light of Plaintiff's arguments regarding the non-adversarial nature of the administrative proceeding, a reasonable jury—after receiving a limiting instruction—could very well decline to credit the SSDI determination weight at trial. *Cf. Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 96 (2d Cir. 1994). As such, the Court concludes that prejudicial effect of the SSDI determination does not substantially outweigh its probative value.

The question remains however, whether the SSDI determination is admissible hearsay. The Federal Rules of Evidence provide that hearsay evidence, defined as out of court statements offered for the truth of the matter asserted, are generally inadmissible. *See* Fed. R. Evidence 801, 802. If evidence is hearsay, it may nevertheless be admissible under one or more hearsay exceptions. Among those exceptions is the "public records and reports exception," which permits admission of:

> Records, reports, statements, or data compilations, in any form of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8). This exception is based on the principle that "public officials perform their duties properly without motive or interest other than to submit fair and accurate reports*." Bradford Tr. Co. v. Merrill Lynch*, 805 F.2d 49, 54 (2d Cir. 1986). Here, the parties do not dispute that the SSDI determination is a hearsay statement; rather, the key point of contention is whether the public records exception applies. (*See* DE 303 at 2–3; DE 304 at 2.) The Court concludes that the factual findings—*not the legal conclusions*—of the SSDI determination, being a public record compiled by a Social Security Administrative Law Judge, are admissible under the public records exception to the general prohibition of hearsay evidence.

Plaintiff concedes that "the only available exception [for the admissibility of the SSDI determination] is the public records exception." (DE 303 at 2.)  Relying on a New Jersey Superior Court, Appellate Division case, *Villanueva v. Zimmer*, 69 A.3d 131, 431 N.J. Super. 301 (Super. Ct. App. Div. 2013), Plaintiff nonetheless insists that the public records exception does not apply to Defendant's SSDI determination.  Even if *Villanueva* were binding on this Court—which it is not—Plaintiff's interpretation of its holding is far too broad.  The *Villanueva* court, after concluding that the "consensus among the various federal districts and circuits appears to favor the view that *legal conclusions* are not admissible as 'findings of fact' under" the public records exception, held that New Jersey's analog to the public records exception does not permit the admission of the *legal conclusion* that a plaintiff is disabled under the SSA as substantive evidence in a personal injury action. *Id.* at 141, 317 (emphasis added).  *Villanueva* does not stand for the proposition that factual findings in an SSDI determination are likewise barred; such findings, conversely, fall squarely within Rule 803(8)'s purview.

Accordingly, the undersigned respectfully recommends—should the District Judge need to reach this point in his analysis—that Plaintiff's motion to strike be denied, and that the factual findings in the SSDI determination be considered in analyzing whether an issue of fact exists as to Defendant's disability.  The SSDI determination is admissible, and the arguments against its admissibility go to weight.

### b.   Are There Material Issues of Fact as to Defendant's Disability?

"Under New York law, the burden of proving total disability within the meaning of the insurance policy falls upon the claimant." *Klein v. Nat'l Life of Vt.*, 7 F. Supp. 2d 223, 226 (E.D.N.Y. 1998) (citing *Goell v. U.S. Life Ins. Co.*, 269 A.D. 573, 55 N.Y.S.2d 732, 732–33 (1st Dep't 1943); *see also Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 124 (2d Cir. 2000) ("Under New York law, [the claimant] bears the burden of proving that he is totally disabled within the meaning of the policies.") (citation omitted).  "[T]he definition of disability in the insurance policy is the relevant definition for the purpose of assessing whether the [claimant] has met his burden." *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 288 (E.D.N.Y. 2014); *see Van Wright v. First Unum Life Ins. Co.*, 740 F.Supp.2d 397, 402 (S.D.N.Y.2010) ("Ultimately, the question of whether or not a claimant is disabled must be judged according to the terms of the [p]olicy.").

Under the Policy, total disability is defined as follows:

> **TOTAL DISABILITY** – means solely due to injuries or sickness: During the Your Occupation Period you are unable to perform the substantial and material duties of your occupation and you are not working . . . . If you are unemployed, total disability means, solely due to injury or sickness, you are prevented from obtaining a job that you are reasonably suited to by your education, training and experience.

(DE 297-3 at 10 (capitalization altered).)  This provision tracks the standard ordinarily employed by New York courts in determining whether someone is totally disabled, which asks whether the individual is no longer able to perform the "material" and "substantial" responsibilities of his or her job.  *See Klein*, 7 F. Supp. 2d at 227 (citing cases); *see Shapiro*, 212 F.3d at 124.  This Court must therefore

> [look] to the professional activities in which the insured was regularly engaged at the time of the onset of the insured's disability. If a claimant is able to perform the duties of a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties, he is not totally disabled.

*London v. Berkshire Life Ins. Co.*, 71 F. App'x 881, 884 (2d Cir. 2003) (summary order) (quoting *Klein*, 7 F.Supp.2d at 227 (citation omitted)).  In assessing a claimant's occupation, the relevant inquiry is into the nature of the work actually performed.  *Id.* (citation omitted).

A material issue of fact exists as to whether Defendant is totally disabled under the Policy.  The parties generally agree that the nature of Defendant's job—setting aside the criminal improprieties discussed above—consisted of acting as an administrator of a computer business and managing medical and construction businesses.  Thus, before the Court is the question of whether Defendant is unable to perform the substantial and material duties of those occupations.  On one hand, Plaintiff's experts conclude that Defendant is not disabled from any mental or physical condition.  Specifically, Doctor Nassar, who conducted a psychiatric examination of Defendant, concluded that "[Defendant] was diagnosed with ADHD that was successfully treated with medication, and that it did not impair his capacity to perform his occupation."  (DE 297-12 at 41.)  An orthopedic surgeon, Dr. Sharma, opined—following an independent medical examination of Defendant's spine and shoulder issues—that Defendant, "[f]rom an objective clinical standpoint, . . . should have been capable of returning to his normal occupational duties . . . in January 2015," and that he was not disabled.  (*Id.* at 50–51.)  On the other hand, the SSDI determination,

dated June 23, 2016, concluded that Defendant has been disabled, as defined by the SSA, since October 21, 2014, and is therefore unable to perform his job function as an administrator, company president, and managing partner.  (DE 300-8 at 16–18.)  The determination included *factual findings* of an investigation into Defendant's medical records from numerous treating physicians, an orthopedic examination, and a psychiatric examination.  (*Id.* at 11–16.)  Plaintiff's expert evidence and the factual findings in Defendant's SSDI determination, when considered together, create a triable issue of fact as to whether Defendant is totally disabled under the Policy.

Accordingly, should the District Judge disagree with the undersigned's recommendation regarding the applicability of criminal activity exclusion in this case, thus keeping the breach of contract claim alive, then the undersigned respectfully recommends that both Plaintiff's and Defendant's motions for summary judgment as to Defendant's breach of contract counterclaim be denied.

### C.  Defendant's Breach of the Implied Covenant of Good Faith Claim

Finally, both parties move for summary judgment on Defendant's breach of the implied covenant of good faith claim seeking consequential damages.  It has long been the law that "an insurer is not liable in excess of the policy limits," *i.e.,* consequential damages, "for the breach of an insurance contract absent bad faith."  *Sunrise One, LLC v. Harleysville Ins. Co. of N.Y.*, 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) (internal quotations and citations omitted) (citing cases).  To establish bad faith, an insured must demonstrate that, under the given facts, no reasonable carrier would deny coverage.  *Id.* (internal quotations and citations omitted).

There is no genuine dispute of material fact regarding Plaintiff's good faith in assessing Defendant's claims and denying coverage.  Although the Court did not reach the issue in its recission discussion, the fact that Defendant did not disclose *any* of his mental health treatment history on the Policy application gave Plaintiff a good faith basis to deny coverage.  While Defendant argues that Plaintiff "ignored the express terms of the Policy prohibiting it from denying coverage or attempting to rescind the Policy absent a judicial finding of fraud" (DE 301 at 17), the Court is satisfied that Plaintiff did not act in

bad faith in its interpretation of that provision.[5] Moreover, Defendant's conclusory assertions that Plaintiff acted in bad faith in its investigation and ultimate denial of the Policy do not satisfy his burden of establishing bad faith or, at minimum, creating an issue of material fact.

Accordingly, the undersigned respectfully recommends—regardless how the Court rules on the breach of contract issue—that Plaintiff's motion for summary judgment as Defendant's breach of the implied covenant of good faith claim be granted, and that Defendant's motion for summary judgment thereof be denied.

## V.   CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that: (1) Defendant's motion for summary judgment be granted as to Plaintiff's recission claims, and that Plaintiff's motion for summary judgment as to those claims be denied; (2) Plaintiff's motion for summary judgment be granted as to Defendant's breach of contract claim based on the Policy's criminal activity exclusion, and that Defendant's motion for summary judgment as to that claim be denied; and (3) Plaintiff's motion for summary judgment as to Defendant's breach of the implied covenant of good faith claim be granted, and that Defendant's motion for summary judgment as to that claim be denied.  Alternatively, should the district court find the Policy's criminal activity exclusion inapplicable in this case, the undersigned recommends that both parties' motions for summary judgment as Defendant's breach of contract claim be denied, and that that claim proceed to trial.

## VI.   OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to

---

[5] In any event, Defendant's allegations thereof are identical to the allegations undergirding his breach of contract claim, and therefore cannot be supported.  *See Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299–300 (S.D.N.Y. 2012) (dismissing plaintiffs' claim of breach of the implied covenant of good faith as duplicative of their breach of contract claim).

the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing

objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report

and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140,

145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v.*

*Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates

as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of*

*Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).


/s/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge

Dated:   Central Islip, New York
          September 8, 2021

25